**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sheri L. Hidenfelter,<br><br>   Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of the<br>Social Security Administration,<br><br>   Defendant. | CIV 11-0053-PHX-MHB<br><br>**ORDER** |

   Pending before the Court is Plaintiff Sheri L. Hidenfelter's appeal from the Social Security Administration's final decision to deny her claim for disability insurance benefits and supplemental security income. After reviewing the administrative record and the arguments of the parties, the Court now issues the following ruling.

**I. PROCEDURAL HISTORY**

   On March 5, 2007, Plaintiff filed an application for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act alleging disability since April 1, 2006. (Transcript of Administrative Record ("Tr.") at 174-81, 182-84.) Her applications were denied initially and on reconsideration and, thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 93-96, 98-104, 105.) A hearing was held on October 13, 2009, before ALJ Milan M. Dostal. (Tr. at 49-86.) On November 10, 2009, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. at 24-36.) The Appeals Council denied Plaintiff's request for review, (Tr. at

1   19-20, 9-18, 1-4), rendering the ALJ's decision the final decision of the Commissioner.

2   Plaintiff then sought judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II.  STANDARD OF REVIEW

The Court must affirm the ALJ's findings if the findings are supported by substantial evidence and are free from reversible legal error.  See Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see Reddick, 157 F.3d at 720.

In determining whether substantial evidence supports a decision, the Court considers the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion.  See Reddick, 157 F.3d at 720.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).  "If the evidence can reasonably support either affirming or reversing the [Commissioner's] conclusion, the court may not substitute its judgment for that of the [Commissioner]."  Reddick, 157 F.3d at 720-21.

## III.  THE ALJ'S FINDINGS

In order to be eligible for disability or social security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An ALJ determines a claimant's eligibility for benefits by following a five-step sequential evaluation:

(1)  determine whether the applicant is engaged in "substantial gainful activity";

(2)  determine whether the applicant has a medically severe impairment or combination of impairments;

1
2

(3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

3
4

(4) if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;

5
6

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant is able to perform other work in the national economy in view of his age, education, and work experience.

7   See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. § 404.1520).  At the

8   fifth stage, the burden of proof shifts to the Commissioner to show that the claimant can

9   perform other substantial gainful work.  See Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir.

10  1993).

11      At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

12  activity since her alleged onset date of April 1, 2006.  (Tr. at 26-27.)  At step two, the ALJ

13  determined that Plaintiff has the following severe impairments: fibromyalgia, arthritis,

14  hypertension, cardiovascular disease, depression, and obesity.  (Tr. at 27.)  At step three, the

15  ALJ stated that Plaintiff did not have an impairment or combination of impairments that met

16  or equaled one of the per se disabling impairments listed at 20 C.F.R. pt. 404, subpt. P, app.

17  1.   (Tr. at 27-30.)   After considering the entire record, including Plaintiff's subjective

18  complaints and the objective medical evidence, the ALJ found that Plaintiff had the residual

19  functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and

20  416.967(b).[1]  (Tr. at 30-34.)  The ALJ indicated that Plaintiff – must be able to change

21  positions from sitting to standing at her option; should avoid climbing ladders, ropes, and

22  scaffolds; should avoid kneeling on her left knee; is limited to occasionally climbing,

23  balancing, stooping, crouching, or crawling; should use a cane when traveling over uneven

24  surfaces; should avoid pushing and pulling with her left leg or using that leg for operation

25  of foot controls; should avoid working at unprotected heights or with hazardous machinery;

26

27
28

[1]  "Residual functional capacity" is defined as the most a claimant can do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks.

and should avoid excessive dust, fumes, gasses, and cold temperatures.  (Tr. at 30-34.)  The ALJ additionally found that Plaintiff's mental impairments are of a moderate nature, can be controlled with medication, and have only a moderate effect on her ability to perform basic work activity.  (Tr. at 30-34.)  At steps four and five, the ALJ relied on vocational expert testimony to find that Plaintiff could not perform her past relevant work as a nurse, but that she had skills from that work that would transfer to the job of telephonic nurse.  (Tr. at 34-36.)  Based on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform the job of telephonic nurse, which existed in significant numbers in the national economy.  (Tr. at 34-36.)  Thus, the ALJ determined that she was not disabled.  (Tr. at 36.)

## IV. DISCUSSION

In her brief, Plaintiff contends that the ALJ erred by: (1) "mischaracterizing and ultimately granting no weight to portions of the physical functional capacity assessments of treating rheumatologist Pace" (Doc. 17 at 16-17) and (2) "rejecting the mental functional capacity assessments of treating psychiatrist Mahl" (Doc. 17 at 17-20).  Plaintiff requests that the Court remand for determination of disability benefits or, in the alternative, remand for further administrative proceedings.

**A.      The ALJ's Physical Residual Functional Capacity Assessment**

Plaintiff first alleges that ALJ erred in "mischaracterizing and ultimately granting no weight to portions of the physical functional capacity assessments of treating rheumatologist Pace" (Doc. 17 at 16-17).  Specifically, Plaintiff contends that the ALJ acknowledged and credited only those portions of Dr. Pace's three assessments that supported the ALJ's ultimate finding of non-disability.  In essence, Plaintiff appears to challenge the ALJ's physical residual functional capacity assessment contending that additional physical functional limitations were warranted.

Plaintiff began seeing rheumatologist Carolyn Pace, M.D., in June of 2006, for evaluation of all-over body pain with a history of depression and anxiety.  (Tr. at 326-27.)  Dr. Pace's examination showed a depressed mood and various tender points, but her reaction

1   "seemed to be somewhat exaggerated." (Tr. at 326-27.) Her narcotic usage was also
2   evaluated. (Tr. at 326-27.)

3           On February 2, 2007, Plaintiff reported having undergone a drug and alcohol
4   treatment program and that she was feeling "much better" since being off of all narcotics and
5   alcohol. (Tr. at 329.) Examination revealed "multiple tender points ... consistent with
6   fibromyalgia." (Tr. at 329.) Plaintiff was prescribed a topical medication. (Tr. at 329.)
7   Subsequent x-rays of the left hip showed mild degenerative changes, (Tr. at 334), and x-rays
8   of the knees showed no abnormalities, (Tr. at 335).

9           Dr. Pace completed a "Rheumatoid Arthritis Impairment Questionnaire" on April 20,
10  2007. (Tr. at 313-19.) Plaintiff's primary symptoms consisted of pain, swelling, depression,
11  morning stiffness, and tender points exacerbated by stress and/or repetitive movements. (Tr.
12  at 315.) Dr. Pace estimated that, in an eight-hour day, Plaintiff could sit two hours a day;
13  stand/walk two hours a day that she would have to alternate sitting and standing every 15 to
14  20 minutes for five-to-ten-minute periods; and that she could lift or carry up to five pounds
15  frequently and up to ten pounds occasionally. (Tr. at 316-17.) Dr. Pace added that Plaintiff's
16  symptoms were "frequently" severe enough to interfere with her attention and concentration;
17  that stress could cause her condition to flare; and that she would likely miss work two or
18  three times a month due to her impairments. (Tr. at 317-18.)

19          Two months later, in June of 2007, Dr. Pace completed a form concerning Plaintiff's
20  ability to perform physical work-related activities. (Tr. at 627-29.) Dr. Pace affirmed that
21  Plaintiff's fibromyalgia limited her ability to function in that she could lift or carry ten
22  pounds occasionally and less than ten pounds frequently; that she could stand or walk no
23  more than two hours a day and sit about four hours; that she could only occasionally climb,
24  reach, handle, finger, and feel objects; and that exceeding these limitations could cause her
25  condition to flare. (Tr. at 627-29.) The following month, July of 2007, Plaintiff told Dr.
26  Pace that her fibromyalgia was getting "somewhat better," (Tr. at 333), and although Dr.
27  Pace offered the same sitting/standing/lifting limitations, she now opined that Plaintiff had
28

greater postural and manipulative abilities, and rescinded her earlier environmental limitations, (Tr. at 333).

On March 25, 2008, Plaintiff expressed a desire to get physical therapy and to seek a job that would accommodate her limitations.  (Tr. at 385.)  Dr. Pace's examination confirmed the presence of multiple tender points consistent with fibromyalgia, along with facet joint arthritis, depression, and anxiety.  (Tr. at 385.)

Dr. Pace completed another Fibromyalgia Impairment Questionnaire on September 3, 2008.  (Tr. at 434-39.)  She affirmed the diagnoses of fibromyalgia and severe arthritis of the lumbosacral spine, which were supported by findings including positive trigger points and lumbar x-rays. (Tr. at 434-35.)  Dr. Pace opined, however, that Plaintiff could, among other things, sit for eight hours and stand for one hour total during an eight-hour day, and could tolerate moderate stress jobs, but continued to require postural and environmental limitations.  (Tr. at 437-38.)

In his decision, the ALJ recognized that Plaintiff had "severe" physical impairments that imposed significant limitations on her ability to perform work-related activities.  (Tr. at 27.)  The ALJ reasonably accommodated Plaintiff's physical limitations by limiting her to a reduced range of work at the light exertional level, with among other things, an option to sit/stand at will.  (Tr. at 30-34.)  Contrary to Plaintiff's assertion, in determining Plaintiff's physical residual functional capacity, the Court finds that the ALJ did not ignore significant aspects of Dr. Pace's opinions concerning Plaintiff's functional limitations.

Indeed, after three examinations (in June of 2006, February of 2007, and July of 2007), in which Dr. Pace's medical findings were limited to noting tender points on examination, unremarkable diagnostic test results, and a notation that Plaintiff's reaction was "somewhat exaggerated," Dr. Pace rendered several opinions.  (Tr. at 334-35, 326-27, 329, 333.)  Dr. Pace's opinions reflected that Plaintiff's functional abilities increased over time, but she essentially concluded that Plaintiff could not sustain work-related activities.  (Tr. at 313-19, 333, 627-29.)

1    After she continued to treat Plaintiff in 2008, Dr. Pace rendered her most recent

2    opinion.  As the ALJ noted, in September of 2008, Dr. Pace opined that Plaintiff could

3    tolerate moderate work stress based on her past work experience and could meet the physical

4    demands of at least sedentary work. (Tr. at 31; 437-38.) Dr. Pace specifically stated that her

5    opinion was retroactive to "one year before [Plaintiff's] first visit" or June of 2005. (Tr. at

6    439.)  Thus, the ALJ reasonably considered Dr. Pace's most recent opinion because she

7    implicitly rescinded her earlier opinions that suggested greater functional limitations were

8    warranted.  The ALJ's consideration of Dr. Pace's most recent opinion was also consistent

9    with Social Security regulations which give greater weight to treating sources' opinions that

10   provide a "longitudinal picture" of a claimant's medical condition.  See 20 C.F.R. §

11   404.1527(d)(2).  Dr. Pace's most recent opinion more accurately reflected Plaintiff's

12   functional limitations because they were based on her entire treatment history – rather than

13   isolated records.

14        Furthermore, any suggestion that the ALJ selected portions of Dr. Pace's opinions to

15   support his disability determination is belied by the fact that other doctors who evaluated

16   Plaintiff's physical functional abilities opined that Plaintiff could perform significant work-

17   related activities.  As the ALJ noted, in September of 2007, Elizabeth Ottney, D.O.,

18   performed an independent consultative examination and opined that Plaintiff's impairments,

19   including fibromyalgia, did not impose any significant work-related restrictions. (Tr. at 31;

20   361-63.) The record also reflects that, later that month, Martha Goodrich, M.D., reviewed

21   Plaintiff's record and found that she could perform work at the light exertional level. (Tr.

22   at 364-71.) And significantly, in March of 2008, Kyle Stoeckmann, M.D., Plaintiff's primary

23   care physician, refused to opine that she was disabled. (Tr. at 536.)  Specifically, Dr.

24   Stoeckmann's notes indicate the following, "[s]he is trying to file for disability with DES and

25   would like me to fill out a form stating that she is disabled.  I told her I was unable to do that.

26   ... She states that her rheumatologist has [been] trying to give her disability for some time

27   now." (Tr. at 536.)  More recently, following Plaintiff's left knee surgery in 2009, both

28   Richard Palmer, M.D., an independent consultative examiner, and Salvatore La Cognata,

1   M.D., Plaintiff's treating orthopedic surgeon, opined that Plaintiff could perform work at

2   least at the sedentary exertional level.  (Tr. at 32-33; 469-73; 621-26.)

3       It is the ALJ's responsibility to weigh the evidence and resolve any evidentiary

4   conflicts.  Here, the ALJ considered all of the medical opinions before reasonably finding

5   that Plaintiff could perform a reduced range of work at the light exertional level.

6       Moreover, Plaintiff's own testimony that for the past two years, she has not taken any

7   pain medication, (Tr. at 56, 67), and her reliance on conservative treatment measures

8   undercuts her claim of disabling symptoms and contention that additional physical functional

9   limitations were warranted.  See Parra v Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007)

10  (evidence of conservative treatment is sufficient to discount claimant's testimony regarding

11  severity of impairment).  Plaintiff also engaged in significant activities of daily living

12  suggesting that she was not as functionally limited as claimed.  See Rollins v. Massanari, 261

13  F.3d 853, 857 (9th Cir. 2001) (claimant's claim of disabling symptoms was undermined by

14  her own testimony about her daily activities).  For instance, Plaintiff testified that she did

15  "everything" at home, including extensive household chores, cooking, and caring for her

16  elderly mother.  (Tr. at 29, 34, 59-60.)  She also attended AA meetings several times a week

17  and a women's group meeting weekly; took care of her pet; was independent with self-care;

18  drove; managed her money; sewed; shopped; spent time with friends; used the computer;

19  read; and watched television.  (Tr. at 29, 34, 59-60, 212-15, 228-33, 340, 361, 463.)

20      Lastly, the fact that Plaintiff stopped working for reasons unrelated to her medical

21  condition also undercuts her claim of disabling symptoms.  (Tr. at 34); see Hunter v.

22  Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (evidence that claimant stopped working for reasons

23  unrelated to impairment, along with other evidence, supported disability determination).  In

24  one report, Plaintiff said she lost her nursing position after she was caught stealing.  (Tr. at

25  372, 589.)  In another report, Plaintiff said she quit her job to care for her ailing elderly

26  mother.  (Tr. at 338.)  As the ALJ noted, even after Plaintiff claimed she became disabled,

27  she told Carlos Vega, Psy.D., and Michael Mahl, M.D., that she continued to actively seek

28  employment.  (Tr. at 34, 338, 569.)  She enrolled in a full-time six month course in billing

and coding, (Tr. at 295, 326, 338), and, thereafter, worked as a bill collector until she was laid off, (Tr. at 55, 61, 578).  Even after Plaintiff lost her bill collector job, she told Dr. Mahl that she was looking for a new job.  (Tr. at 569.)  The fact that Plaintiff stopped working for reasons unrelated to her health, coupled with evidence that she continued to actively seek employment after she claimed to be "disabled" provides further support that her symptoms were not as disabling as she claimed.  See Bray v. Comm'r of Soc. Sec., 554 F.3d 1219, 1227 (9th Cir. 2009) (claimant's recent work activity weighed against claim of debilitating illness).

In sum, the ALJ provided: (1) a substantial and detailed discussion of the objective medical and other evidence; (2) a resolution of possible inconsistencies in the evidence; and (3) a logical explanation of the effects of symptoms on the individual's ability to work.  The Court, therefore, finds that the ALJ provided an adequate assessment of Plaintiff's limitations and a narrative discussion of how the medical evidence and other evidence of record supported his assessment of Plaintiff's physical residual functional capacity.  The ALJ's physical residual functional capacity finding is supported by substantial evidence.

**B.    Mental Impairments**

Plaintiff next argues that the ALJ erred by "rejecting the mental functional capacity assessments of treating psychiatrist Mahl." (Doc. 17 at 17-20.)  Plaintiff states that the ALJ's reasons for finding that Dr. Mahl's multiple opinions "are worthy of no weight" are insufficient as a matter of law.

Agency regulations distinguish among the opinions of three types of accepted medical sources:  (1) sources who have treated the claimant; (2) sources who have examined the claimant; and (3) sources who have neither examined nor treated the claimant, but express their opinion based upon a review of the claimant's medical records.  See 20 C.F.R. § 404.1527.  A treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a non-examining reviewing or consulting physician's opinion.  See Benecke v. Barnhart, 379 F.3d 587, 592 (9th Cir. 2004); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  The Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of a treating or

examining physician.  See Lester, 81 F.3d at 830.  If the opinion is contradicted, it can be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  See Andrews, 53 F.3d at 1043.  Since the opinions of Dr. Mahl were contradicted by numerous medical sources in the record, the specific and legitimate standard applies.

Historically, the courts have recognized the following as specific, legitimate reasons for disregarding a treating or examining physician's opinion: conflicting medical evidence; the absence of regular medical treatment during the alleged period of disability; the lack of medical support for doctors' reports based substantially on a claimant's subjective complaints of pain; medical opinions that are brief, conclusory, and inadequately supported by medical evidence.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); Flaten v. Secretary of Health and Human Servs., 44 F.3d 1453, 1463-64 (9th Cir. 1995); Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  The Court finds that the ALJ properly gave specific and legitimate reasons, based on substantial evidence in the record, for discounting the various opinions of Dr. Mahl.

Following Plaintiff's admittance to the Chandler Valley Hope Treatment Center in November of 2006, Dr. Mahl performed a psychiatric evaluation of Plaintiff on December 7, 2006.  (Tr. at 588-90.)  A mental status examination was unremarkable, aside from noting a depressed mood and affect.  (Tr. at 589.)  Dr. Mahl diagnosed Plaintiff with opioid dependency and recurrent moderate major depressive disorder.  (Tr. at 589.)  He assigned a current global assessment of functioning (GAF) score of 60, indicating moderate symptoms.  (Tr. at 589.)  Dr. Mahl prescribed psychiatric medications and follow-up care.  (Tr. at 590.)

In 2007, Dr. Mahl provided monthly follow-up care.  (Tr. at 576-87.)  Dr. Mahl's progress notes contained minimal, if any, clinical findings.  (Tr. at 576-87.)  Plaintiff told Dr. Mahl that she was "doing well overall" or felt "stable" on numerous occasions.  (Tr. at 576-79, 581, 583, 585, 587.)  When Plaintiff claimed an increase in symptoms, Dr. Mahl adjusted Plaintiff's medications to address her symptoms, including withdrawal symptoms related to her drug dependency issues.  (Tr. at 576-87.)

In August of 2007, Dr. Vega performed an independent psychiatric examination. (Tr. at 338-46.) Plaintiff told Dr. Vega that she obtained a certificate in medical billing and was actively seeking employment. (Tr. at 338.) She had a history of depression, but had a "very favorable" response to anti-depressants. (Tr. at 339.) In addition, her pain medication provided complete relief. (Tr. at 339-40.) A mental status examination revealed completely normal findings (including no concentration or memory problems). (Tr. at 339.) Dr. Vega concluded that Plaintiff's conditions were in remission due to medication. (Tr. at 340.) Dr. Vega opined that Plaintiff had no psychological limitations that would affect her ability to work. (Tr. at 340.)

In 2008, Dr. Mahl continued to provide monthly follow-up care. (Tr. at 569-75.) Dr. Mahl's progress notes were, once again, primarily limited to Plaintiff's subjective complaints, particularly withdrawal symptoms and the need for opioid therapy, as well as noting medication adjustments. (Tr. at 569-75.)

In February of 2008, Andres Kerns, Ph.D., a State agency psychologist, reviewed the medical record. (Tr. at 311, 347-363.) Dr. Kerns agreed that Plaintiff's mental impairments were "[n]ot [s]evere," and did not impose any mental functional limitations. (Tr. at 311, 347-363.) Later that month, Marc Schwartz, D.O., who was covering for Dr. Mahl, noted normal mental status examination findings, aside from her mood and affect, and recommended individual therapy. (Tr. at 421-29.)

In March of 2009, Dr. Schwartz completed a Psychiatric/Psychological Impairment Questionnaire. (Tr. at 488-95.) Dr. Schwartz indicated that he treated Plaintiff monthly since September of 2008. (Tr. at 488.) Dr. Schwartz assigned Plaintiff a GAF score of 62 for the past year, indicating mild symptoms. (Tr. at 488.) Dr. Schwartz further opined, in part, that since February of 2008, Plaintiff had at most moderate limitations in specific areas of mental functioning, and could tolerate only low stress jobs. (Tr. at 491-94.)

Plaintiff returned to Dr. Mahl in August of 2009. (Tr. at 554-68.) At that time, Plaintiff denied any recent suicidal or homicidal ideation. (Tr. at 565.) A mental status examination was normal, including intact memory; good judgment and insight; no psychotic

1   features, delusions, hallucinations, or paranoia; euthymic mood; appropriate affect; and
2   logical and coherent speech.  (Tr. at 566-67.)  Despite his unremarkable examination, Dr.
3   Mahl assigned Plaintiff a current GAF score of 40, and a GAF score of 45 for the past year,
4   indicating major and/or serious impairment.  (Tr. at 568.)  Dr. Mahl also concluded that
5   Plaintiff met the criteria for opioid dependence due to her Vicodin intake and adjusted her
6   medications.  (Tr. at 561-62.)

7          Later that month, Plaintiff admitted that she was taking the wrong dose of one of her
8   medication, (Tr. at 556), and Dr. Mahl opined that, "[this] explains her cognitive confusion
9   [and] memory loss" (Tr. at 556).  In September of 2009, Dr. Mahl continued to adjust
10  Plaintiff's medications to address her complaints.  (Tr. at 552, 554-55.)  Later that month, Dr.
11  Mahl opined that Plaintiff was "totally disabled" without consideration of any past or present
12  drug and/or alcohol use.  (Tr. at 601.)  Dr. Mahl also issued a letter describing Plaintiff's
13  course of treatment.  (Tr. at 612-14.)  In his letter, Dr. Mahl opined that Plaintiff was
14  "disabled" at the present time due to her serious mental illness and fibromyalgia.  (Tr. at
15  614.)  Dr. Mahl also completed a Psychiatric/Psychological Impairment Questionnaire, (Tr.
16  603-10), and affirmed his GAF scores of 40 and 45, (Tr. at 603).  Dr. Mahl opined that, since
17  July of 2008, Plaintiff had mild to marked limitations in specific areas of mental functioning.
18  (Tr. at 606-08, 610.)

19         After considering the objective medical evidence in conjunction with other evidence
20  of record, the ALJ stated, "[t]he undersigned gives no weight to the opinion of Michael Mahl,
21  M.D., who performed a psychiatric evaluation of the claimant on December 12, 2007 and
22  again on August 7, 2009 and who opined in a September 13, 2009 letter that the claimant was
23  disabled and unable to work for at least 12 months."  (Tr. at 33.)  In so finding, the ALJ
24  noted, "[t]reating source opinions on issues that are reserved to the Commissioner are never
25  entitled to controlling weight or special significance.  Giving controlling weight to such
26  opinions would, in effect, confer upon the treating source the authority to make the
27  determination or decision about whether an individual is under a disability, and thus would

28

1   be an abdication of the Commissioner's statutory responsibility to determine whether an
2   individual is disabled." (Tr. at 33-34.)

3        Next the ALJ addressed Dr. Mahl's opinion which found that Plaintiff had GAF score
4   of 40, and a GAF score of 45 for the past year, indicating major and/or serious impairment.
5   (Tr. at 34.)  In extensive detail, the ALJ determined that such low scores are simply not
6   supported by Dr. Mahl's own treatment notes; by other medical evidence of record; or by
7   Plaintiff's own testimony concerning her activities of daily living demonstrating that Plaintiff
8   is "very functional." (Tr. at 34.)  The Court agrees with the ALJ's conclusion.

9        Dr. Mahl's progress notes, indeed, provided little support for his opinion of extreme
10  functional limitations.  For instance, Dr. Mahl opined that Plaintiff's symptoms and
11  limitations existed at the same level of severity from July of 2008 to the present.  (Tr. at 610.)
12  However, Dr. Mahl did not even treat Plaintiff during all but the last month of this timeframe.
13  (Tr. at 563.)  Furthermore, Dr. Mahl's progress notes were noticeably devoid of significant
14  clinical findings, and instead primarily documented Plaintiff's subjective complaints.  (Tr.
15  at 552-90.)  On those few occasions that Dr. Mahl documented clinical findings – in
16  December of 2006 and August of 2009 – the findings were mostly unremarkable, including
17  intact memory; good judgment and insight; no psychotic features, delusions, hallucinations,
18  or paranoia; and logical and coherent speech. (Tr. at 566-67, 589.)  The incongruity between
19  Dr. Mahl's opinion and the relatively unremarkable clinical findings in his progress notes
20  strongly undercut the reliability of Dr. Mahl's opinion.  See Zebra v. Comm'r of Soc. Sec.
21  Admin., 279 Fed.Appx. 438, 439 (9th Cir. 2008) (unpublished) (ALJ reasonably found
22  claimant's depression not severe despite GAF score of 45 where the bulk of the
23  psychologist's examination revealed claimant was functioning normally and her depression
24  was in remission); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999)
25  (recognizing that a physician's opinion "premised to a large extent upon the claimant's own
26  accounts of his symptoms and limitations" may be disregarded where those complaints have
27  been "properly discounted").

28

1    Not only was Dr. Mahl's opinion unsupported by his progress notes, but it was also
2    inconsistent with other substantial evidence in the record.  At least two doctors – including
3    Drs. Vega and Schwartz – found that Plaintiff could perform significant mental work-related
4    activities. (Tr. at 32-33.) Specifically, after performing an extensive consultative psychiatric
5    examination that revealed normal findings (including no concentration or memory problems),
6    Dr. Vega opined that Plaintiff did not have any psychological limitations that would affect
7    her ability to work.  (Tr. at 338-46.)  Dr. Vega's findings, however, were not unique.  Dr.
8    Schwartz, Plaintiff's other treating psychiatrist – who actually treated her during the
9    timeframe addressed by Dr. Mahl's opinion (September of 2008 through February of 2009)
10   – also offered an opinion of her functional limitations. (Tr. at 421-28, 488-95.) Dr. Schwartz
11   opined that, since February of 2008, Plaintiff had at most moderate mental functional
12   limitations and could tolerate low stress work, and assigned her a GAF score of 62 during
13   the past year, indicating mild symptoms. (Tr. at 421-28, 488-95.) The ALJ accorded "great
14   weight" to Dr. Schwartz's opinion because his opinion was supported by the objective
15   medical evidence of record and Plaintiff's activities of daily living. (Tr. at 33, 339, 427, 568,
16   589.)

17          Additionally, the ALJ also found, and the record demonstrates, that further mental
18   functional limitations were not warranted because Plaintiff's symptoms were "controlled by
19   appropriate medications without adverse side effects." (Tr. at 30); see Sample v. Schweiker,
20   694 F.2d 639, 642-43 (9th Cir. 1982) (an impairment which could reasonably be alleviated
21   by medication or treatment could not serve as a basis for a finding of disability).  Plaintiff
22   specifically told Drs. Vega and Ottney that her depression medication controlled her
23   condition. (Tr. at 339, 361.) And, Plaintiff also told Dr. Mahl on numerous occasions that
24   she was "doing well overall" or was "stable." (Tr. at 31, 576, 579, 581, 583, 585, 587.) To
25   the extent that Plaintiff claimed increased symptoms, the ALJ noted that these periods of
26   exacerbations were tied to changes in her medication due to her drug addiction, or non-
27   compliance with her medication regimen. (Tr. at 31, 34.) Dr. Mahl specifically noted that

28

1  Plaintiff's incorrect use of her medication explained "her cognitive confusion and memory

2  loss." (Tr. at 556.)

3      Lastly, as discussed in the previous section and noted by the ALJ, Plaintiff's

4  significant activities of daily living coupled with the fact that she left work for reasons

5  unrelated to her medical condition also undermined Dr. Mahl's opinion that Plaintiff's mental

6  impairment was "disabling." (Tr. at 34, 338, 372, 589.)

7      The ALJ is tasked with determining credibility and resolving conflicts in medical

8  testimony, not this Court. See Andrews, 53 F.3d at 1039. "The ALJ need not accept an

9  opinion of a physician ... if it is conclusionary and brief and is unsupported by clinical

10  findings." Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). When "the evidence is

11  susceptible to more than one rational interpretation," this Court "must uphold the ALJ's

12  decision." Andrews, 53 F.3d at 1039-40. In light of the medical evidence, the Court finds

13  that ALJ provided specific and legitimate reasons, based on substantial evidence in the

14  record, for discounting the opinions of Dr. Mahl.

15  **V. CONCLUSION**

16      Substantial evidence supports the ALJ's decision to deny Plaintiff's claim for

17  disability insurance benefits and supplemental security income benefits in this case. The

18  ALJ's physical residual functional capacity finding is supported by substantial evidence, and

19  he provided specific and legitimate reasons, based on substantial evidence in the record, for

20  discounting the opinions of Dr. Mahl. Consequently, the ALJ's decision is affirmed. Based

21  upon the foregoing discussion,

22      **IT IS ORDERED** that the decision of the ALJ and the Commissioner of Social

23  Security be affirmed;

24  ///

25  ///

26  ///

27  ///

28  ///

1    **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment

2    accordingly.  The judgment will serve as the mandate of this Court.

3        DATED this 26th day of March, 2012.

4

5    _____

6                    Michelle H. Burns
                United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28